*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0346p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

CINCOM SYSTEMS, INC.,

        *Plaintiff-Appellee,*

          *v.*

NOVELIS CORP.,

        *Defendant-Appellant.*

No. 07-4142

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 05-00152—Susan J. Dlott, Chief District Judge.

Argued: September 8, 2008

Decided and Filed: September 25, 2009

Before: BOGGS, GIBBONS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Irene C. Keyse-Walker, TUCKER, ELLIS & WEST LLP, Cleveland, Ohio, for Appellant. Joseph Michael Callow, Jr., KEATING, MUETHING & KLEKAMP, PLL, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Irene C. Keyse-Walker, Henry E. Billingsley II, Karen E. Ross, TUCKER, ELLIS & WEST LLP, Cleveland, Ohio, for Appellant. Joseph Michael Callow, Jr., James Eugene Burke, Jennifer J. Morales, KEATING, MUETHING & KLEKAMP, PLL, Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge. Novelis Corporation appeals from the order of the district court granting summary judgment to plaintiff Cincom Sysems, Inc. ("Cincom"), on its claim of copyright infringement. *See* 17 U.S.C. § 501. Novelis argues that the district court erred by concluding that a series of mergers Novelis underwent as part of an internal corporate restructuring resulted in a prohibited transfer of the software license

1

Cincom had granted to a former Novelis subsidiary. Finding that our prior decision in *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090 (6th Cir. 1979), governs Novelis's appeal, we agree with the district court that Novelis's actions led to an impermissible transfer of the software license and accordingly affirm its judgment.

## I.

Cincom is an Ohio-based corporation that develops, licenses, and services software for its corporate customers. The rights to use two of Cincom's most popular software offerings form the basis of the current dispute. SUPRA© is a database management program that allows a corporation to manage millions of records. MANTIS© is a fourth-generation application development system, *i.e.*, a computer language that allows a corporation's software professionals to develop computer programs that allow the corporation's operations to function more smoothly. Cincom is the sole owner of all rights to both the SUPRA© and MANTIS© software. Rather than sell the computer programs themselves, Cincom only sells licenses that allow its customers to use the two programs for an annual fee.

On July 5, 1989, Cincom agreed to license SUPRA© and MANTIS© to Alcan Rolled Products Division ("Alcan Ohio"), an Ohio-based corporation that would later become known as Novelis. The license Cincom issued listed "Alcan Rolled products [*sic*] Division" as the "Customer" and granted to Alcan Ohio "a non-exclusive and non-transferable license" to use Cincom's software. (License at 1.) The license agreement clarified that the two software programs "constitute proprietary and confidential information of Cincom and that the protection of this information is of the highest importance." (License at 2.) Consequently, Alcan Ohio could only place the software on designated computers that the parties specifically listed in a schedule attached to the license. (License at 1.) Alcan Ohio listed the designated computer as one located at its facility in Oswego, New York. The license agreement closed by noting that Ohio law would govern its terms and that Alcan Ohio could "not transfer its rights or obligations under this Agreement without the prior written approval of Cincom." (License at 3.)

Before the commencement of Alcan Ohio's internal reorganization, Alcan Ohio was a wholly-owned subsidiary of Alcan, Inc., a Canadian corporation. On May 15, 2003, Alcan Ohio created a separate corporation known as Alcan of Texas ("Alcan Texas"), organized

under the laws of Texas. Alcan Texas, like Alcan Ohio, was also a wholly-owned subsidiary of the Canadian parent corporation Alcan, Inc. On July 30, 2003, Alcan Ohio merged into Alcan Texas, with Alcan Texas remaining as the surviving corporate entity. The next day, Alcan Texas simultaneously merged into itself and its three Texas subsidiaries. As a result, the former rolled products division of Alcan Ohio became a subsidiary of Alcan Texas known as Alcan Fabrication Corporation. In September 2003, Alcan Fabrication Corporation changed its name to Alcan Aluminum Corporation. A final name change occurred on January 1, 2005, when Alcan Aluminum Corporation changed its name to its current appellation, Novelis. Thus, as of January 2005, the software Alcan Ohio licensed from Cincom remained on the same computer in Oswego, New York, but in a plant now owned by an entity named Novelis. Alcan Ohio never sought or obtained Cincom's written approval to continue to use the SUPRA© and MANTIS© software before restructuring its rolled products division.

Upon learning of the corporate changes Alcan Ohio underwent, Cincom filed suit on March 11, 2005, in the United States District Court for the Southern District of Ohio, alleging that Novelis's actions violated the license agreement Cincom entered with Alcan Ohio. Following discovery, the parties agreed upon stipulated facts and filed separate motions for summary judgment. The district court determined that Alcan Ohio's merger with Alcan Texas effected a transfer of the license under Ohio law. *Cincom Sys., Inc. v. Novelis Corp.*, No. 1:05cv152, 2007 U.S. Dist. LEXIS 2721, at *19-20 (S.D. Ohio Jan. 12, 2007). Because Novelis had failed to distinguish our prior holding in *PPG*, the district court entered summary judgment as to liability for Cincom. *Id.* at *19-20. The district court certified its conclusion as involving a controlling question of law as to which substantial ground for disagreement existed so that the parties could seek an interlocutory appeal of the court's order. *Id.* at *20; *see* 28 U.S.C. § 1292(b). We denied Novelis's application for permission to appeal. *In re Novelis Corp.*, No. 07-0302, slip op. at 2 (6th Cir. Apr. 20, 2007). The parties then agreed to an order stipulating the amount of damages Cincom had suffered as $459,530.00, equal to the amount of Cincom's initial licensing fee. The district

court approved the order on August 2, 2007.**[1]** Novelis timely appealed the district court's final judgment.

## II.

We review a district court's grant of a summary judgment motion *de novo*. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007). Summary judgment is appropriate where there are no *genuine* issues of *material* fact in dispute, and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may meet its burden by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action'" rather than a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Because both parties stipulated to the necessary facts and only issues of law remain, this case is especially suited for summary disposition.

Novelis argues on appeal that the district court erred in granting summary judgment to Cincom for two reasons. First, Novelis asserts that the district court misinterpreted our prior holding in *PPG* by failing to look at the individual contracting parties' intent as expressed in the licensing agreement. Novelis claims that while the agreement at issue in *PPG* showed a clear intent to prevent the license from coming into the possession of a competitor, Cincom's license demonstrates no concern with preventing internal corporate reorganizations. Second, Novelis claims that a change in Ohio substantive corporate law since our *PPG* decision, as demonstrated by state cases interpreting the new language, requires us to find that no transfer of the license occurred

---

**[1]**Novelis and Cincom also agreed that each litigant would bear its own attorneys' fees, despite the language of the licensing agreement allowing the prevailing party to have its attorneys' fees paid by the unsuccessful party.

as a result of Alcan Ohio's merger with Alcan Texas.  We will consider each argument Novelis advances in turn.

## A.

In *PPG*, we addressed the question of "whether the surviving or resultant corporation in a statutory merger acquires patent license rights of the constituent corporations."[2] 597 F.2d at 1091.  *PPG* involved two glass fabrication corporations that had developed a new industrial process for shaping glass for various commercial uses. *Id.*  PPG granted a "non-exclusive, non-transferable" license to the Permaglass Corporation to use this new "gas hearth technology." *Id.* at 1091-92.  The license further noted that the grant to Permaglass was "personal to PERMAGLASS and non-assignable except with the consent of PPG first obtained in writing." *Id.* at 1092.  Despite this language, Permaglass merged with Guardian Industries, a corporation that manufactured windshields for automobiles. *Id.*  Under the laws of Delaware and Ohio, which governed the merger, Permaglass's licenses would automatically transfer to and vest in the successor corporation, Guardian Industries. *Id.* at 1095-96.  We concluded that in the context of intellectual property, a license is presumed to be non-assignable and non-transferable in the absence of "express provisions to the contrary." *Id.* at 1095.  Because this was a mandate of federal law, Ohio law could not override this presumption. *Id.* at 1093.  We therefore reversed the district court and ordered judgment entered in favor of PPG. *Id.* at 1097.

## 1.

We have had no occasion to consider our holding in *PPG* since its original issuance in 1979.  Consequently, we take this opportunity to explain more fully the complex interaction of federal and state law that occurs when interpreting intellectual property licenses.  Federal common law governs "questions with respect to the assignability of a patent [or copyright] license." *Id.* at 1093.  While the Supreme Court

---

[2]In copyright cases such as this, we refer to the case law interpreting patent law "because of the historic kinship between patent law and copyright law." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984).

famously declared in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), that "[t]here is no federal general common law," there are "limited . . . situations where there is a significant conflict between some federal policy or interest and the use of state law" that require "judicial creation of a special federal rule" of common law. *O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 87 (1994) (internal quotation marks and citations omitted). Such a special rule clearly is justified in the realm of intellectual property because "[t]he fundamental policy of the patent system is to 'encourage the creation and disclosure of new, useful, and non-obvious advances in technology and design' by granting the inventor the reward of 'the exclusive right to practice the invention for a period of years.'" *Everex Sys., Inc. v. Cadtrak Corp.* (*In re CFLC, Inc.*), 89 F.3d 673, 679 (9th Cir. 1996) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989)). Allowing state law to permit the free assignability of patent or copyright licenses would "undermine the reward that encourages invention." *Id.* This is because any entity desiring to acquire a license could approach *either* the original inventor *or* one of the inventor's licensees. Absent a federal rule of decision, state law would transform every licensee into a potential competitor with the patent or copyright holder. In such a world, the holder of a patent or copyright would be understandably unwilling to license the efforts of his work, thereby preventing potentially more efficient uses of the invention by others. *See id.*; *cf. Rhone-Poulenc Agro S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1328 (Fed. Cir. 2002) ("[C]ourts generally have acknowledged the need for a uniform national rule that patent licenses are personal and non-transferrable in the absence of an agreement authorizing assignment.").

Despite the federal common law rule that copyright licenses are unassignable absent express language to the contrary, "[s]tate law is not displaced merely because the contract relates to intellectual property." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979). The states are thus "free to regulate the use of . . . intellectual property in any manner not inconsistent with federal law." *Id.* Applying these principles, state contract law will govern the interpretation of a license because a license is merely a type of contract. *In re CFLC*, 89 F.3d at 677; *see also Power Lift, Inc. v. Weatherford Nipple-*

*Up Sys., Inc.*, 871 F.2d 1082, 1085-86 (Fed. Cir. 1989) (noting that "a license agreement is a contract governed by ordinary principles of state contract law"). As there is no general federal corporate law, state law will also determine whether a merger results in the transfer of an intellectual property license. However, where state law would allow for the transfer of a license absent express authorization, state law must yield to the federal common law rule prohibiting such unauthorized transfers. *PPG*, 597 F.2d at 1093; *see also In re CFLC, Inc.*, 89 F.3d at 679 (federal law must govern to prevent free assignability and to promote creativity); *In re Alltech Plastics, Inc.*, 71 B.R. 686, 689 (Bankr. W.D. Tenn. 1987) (Because "[t]he rights of the patent owner to license the use of his invention is [*sic*] a creature of federal common law . . . . [i]t follows that questions regarding the assignability of patent licenses are controlled by federal law.").

**2.**

Novelis's argument that we can distinguish our decision in *PPG* based upon the specific intent of the contracting parties is incorrect. As in *PPG*, Cincom granted Novelis a non-exclusive and non-transferrable license. *Compare PPG*, 597 F.2d at 1092, *with* License at 1. Both the license at issue in *PPG* and the license issued to Novelis also required the express written approval of the grantor prior to any transfer of the license. *Compare PPG*, 597 F.2d at 1092, *with* License at 3. The plain text of the license is clear. No transfers are permissible without express written approval.[3] *See Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007) ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties."(citation omitted)).[4]

The fact that the license at issue in *PPG* ultimately found its way into the hands of a competitor does not serve to distinguish our holding from the present set of facts.

---

[3] It is undisputed that Novelis gave no notification to Cincom of its plans to merge Alcan Ohio out of existence as a part of its restructuring.

[4] We once again emphasize that even if the license were silent as to the issue of transfers, federal common law would serve to fill the gap with its default rule that no transfer is allowed without express authorization. *See PPG*, 597 F.2d at 1093. Here, however, the express wording of the license itself prohibited unauthorized transfers so that simple contract construction under state law provides the answer.

While it is true that the primary reason for the federal common law rule prohibiting the transfer of a license without authorization is to prevent the license from coming into a competitor's possession, this does not translate into a rule of "no competitor possession, no foul." *See In re CFLC, Inc.*, 89 F.3d at 679.  The harm is the breach of the terms of the license:  the violation of the federal policy (or contract term) allowing the copyright or patent holder to control the use of his creation.  The fact that Novelis is not a competitor of Cincom is therefore immaterial.  *PPG*'s holding governs the resolution of Cincom's complaint.  If Ohio law served to transfer the license from Alcan Ohio to Novelis as a result of the internal merger, Novelis violated the express terms of its non-transferable license.  It is to that issue to which we now turn.

**B.**

Novelis argues that Ohio's statutory merger law has changed since we first considered its effect on intellectual property licenses thirty years ago.  Novelis thus reasons that our holding in *PPG* that Ohio's merger law effects an impermissible transfer of ownership in a license must change, as well.  Cincom responds that the changes in Ohio law are merely cosmetic and still result in an impermissible transfer of the license it originally granted Alcan Ohio.

At the time of our decision in *PPG*, Ohio's statutory merger law provided that "all property of a constituent corporation shall be '*deemed to be [t]ransferred to and vested in* the surviving or new corporation without further act or deed.'" *PPG*, 597 F.2d at 1096 (quoting Ohio Rev. Code Ann. § 1701.81(A)(4) (1955)) (emphasis added).  The current statute provides:

> The surviving or new entity *possesses all assets and property of every description*, and every interest in the assets and property, wherever located, and the rights, privileges, immunities, powers, franchises, and authority, of a public as well as of a private nature, of each constituent entity, and, subject to the limitations specified in section 2307.97 of the Revised Code, all obligations belonging to or due to each constituent entity, *all of which are vested in the surviving or new entity without further act or deed.*  Title to any real estate or any interest in the real

estate vested in any constituent entity shall not revert or in any way be
impaired by reason of such merger or consolidation.

Ohio Rev. Code Ann. § 1701.82(A)(3) (2009) (emphasis added).  Novelis argues that the
deletion of the prior statute's language explaining that all property shall be deemed
"[t]ransferred to" the surviving corporation prevents a finding that Alcan Ohio's merger
with Alcan Texas transferred the license.  *See Id.* § 1701.81(A)(4) (1955).  Our holding
in *PPG* did not hang by so slender a thread.

Ohio's law provides that upon a merger, "[t]he separate existence of each
constituent entity other than the surviving entity . . . shall cease."  *Id.* § 1701.82(A)(1).
Alcan Ohio, the rightful holder of the Cincom license, thus no longer exists as a legal
entity under Ohio law.  Ohio law further provides that the license once held by Alcan
Ohio automatically vested by operation of law in Novelis Corporation, Alcan Ohio's
successor, after the completion of the corporate restructuring.  *See id.* § 1701.82(A)(3).
The vesting of the license in the surviving entity could not occur without being
transferred by the old entity.  As we explained in *PPG*, "A transfer is no less a transfer
because it takes place by operation of law rather than by a particular act of the parties.
The merger was effected by the parties and the transfer was a result of their act of
merging."  597 F.2d at 1096.  The deletion of the word transferred does not change this
analysis.  Federal common law, and the actual language of the license in this case, is
clear: the only legal entity that can hold a license from Cincom is Alcan Ohio.  If any
other legal entity holds the license without Cincom's prior approval, that entity has
infringed Cincom's copyright because a transfer has occurred.  Simply put, *in the context
of a patent or copyright license*, a transfer occurs any time an entity other than the one
to which the license was expressly granted gains possession of the license.  *Id.* at 1095-
96.  Alcan Ohio no longer owns the plant in Oswego, New York, where the designated
computer licensed to contain Cincom's software resides, because Alcan Ohio no longer
exists.  Novelis now owns the plant and has possession of the license under Ohio law.
Consequently, Novelis has infringed upon Cincom's copyright.  *Id.* at 1096-97.

Further demonstrating that the deletion of the word "[t]ransferred" from the Ohio
statute does not change our analysis is the fact that the merger at issue in *PPG* actually

occurred under both Ohio and Delaware law. Delaware law, both in 1979 and today, requires that all property of the constituent corporation "'*shall be vested in* the corporation surviving or resulting from such merger or consolidation.'" *Id.* at 1096 (quoting 8 Del. C. § 259(a)). We considered the difference in statutory language and concluded that what matters for the purpose of determining whether the license actually transferred is if the same legal entity held the license. Under either statute, the legal entity holding the license changed; therefore, Guardian Industries infringed PPG's patent. *Id.* at 1096-97.

The state cases Novelis cites in its briefs do not force us to reconsider our interpretation of Ohio law. In *TXO Production Co. v. M.D. Mark Inc.*, 999 S.W.2d 137, 143 (Tex. App. 1999), a Texas court held that a merger of a subsidiary into its parent corporation did not violate a non-assignability clause in a contract. The Texas court had examined the substantially similar Texas, Ohio, and Delaware merger statutes, all of which applied to the transaction, and explicitly rejected our opinion in *PPG*. *Id.* at 141-42. However, as the Texas Court of Appeals noted, our opinion in *PPG* rested upon the "strong public policy against the implied assignment of patent licenses." *Id.* at 141 n.4. The Texas contract at issue in *TXO* did not involve intellectual property, *id.*, and therefore instead fell into the general contract law principle that "courts disfavor forfeiture." *Id.* at 140. While the Texas court fretted that "a requirement that the surviving corporation pay a fee in the event of a merger unnecessarily hinders the free flow of those rights to the surviving corporation," this is exactly the purpose of copyright law – to prevent the "free flow" of information without the author's permission. *Id.* at 142; *see also In re CFLC, Inc.*, 89 F.3d at 679. *TXO* is therefore inapposite because it does not address the effect of the Ohio merger statute in the context of intellectual property.[5]

---

[5]The Texas Court of Appeals further observed that the contracting parties could have foreseen a merger and specifically prohibited a transfer in such an instance. *TXO*, 999 S.W.2d at 143. This is exactly the opposite of federal common law's presumption of non-transferability in the event of a license's silence. *Cf. PPG*, 597 F.2d at 1093.

*ASA Architects, Inc. v. Schlegel*, 665 N.E.2d 1083 (Ohio 1996), is similarly unhelpful to Novelis. There the Ohio Supreme Court held that the contractual obligations under a stock purchase agreement "flowed, by operation of law," to the successor corporation. *Id.* at 1089. We have found just the same. Ohio law causes the license agreement to flow to Novelis following Alcan Ohio's merger. The difference is that because this contract involves a copyright license, such a transfer without permission is inherently a breach of the contract. *PPG*, 597 F.3d at 1093; *see also In re CFLC, Inc.*, 89 F.3d at 679; *Unarco Indus., Inc. v. Kelley Co.*, 465 F.2d 1303, 1306 (7th Cir. 1972) ("[F]ederal law applies to the question of the assignability of the patent license.").

## III.

When Alcan Ohio merged with Alcan Texas, the license granted by Cincom solely to Alcan Ohio transferred to the surviving corporation, now known as Novelis. Because Novelis did not abide by the express terms of Cincom's license and gain Cincom's prior written approval, Novelis infringed Cincom's copyright. We therefore affirm the judgment of the district court.