In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3618, 11-3838 and 12-1280

H-D MICHIGAN, LLC *et al.*,

*Plaintiffs-Appellees*,

*v.*

HELLENIC DUTY FREE SHOPS S.A.,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 2:11-cv-00742-LA—**Lynn Adelman**, *Judge.*

ARGUED MAY 24, 2012—DECIDED SEPTEMBER 5, 2012

Before CUDAHY, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* These consolidated appeals arise from an international trademark licensing dispute between plaintiff Harley-Davidson Motor Company and its former Greek licensee, defendant Hellenic Duty Free Shops S.A. ("DFS"). DFS challenges a series of injunctions issued by the United States District Court for the Eastern District of Wisconsin. Appeal No. 11-3618 challenges the district court's orders of November 7 and 17,

2011 denying DFS's motions to dissolve a temporary restraining order entered on September 6, 2011. No. 11-3838 challenges a preliminary injunction entered on December 20, 2011. No. 12-1280 challenges a further preliminary injunction issued February 7, 2012 addressing DFS's efforts to litigate this same dispute in the courts of Greece.

Harley-Davidson made strong showings that DFS was deliberately breaching a binding trademark licensing agreement. Since Harley-Davidson learned of the breaches and terminated the parties' licensing agreement, DFS has tried numerous legal twists and contortions to try to avoid the legal consequences of its actions. DFS's primary argument is that the term in the licensing agreement giving consent to personal jurisdiction in the courts of Wisconsin is not binding on it, and DFS raises numerous other challenges to the injunctions. The district court correctly found that it had jurisdiction over DFS and properly rejected its other arguments and tactics. We affirm.

I. *Factual and Procedural Background*

  A. *The Licensing Agreement and the Breach*

Harley-Davidson manufactures motorcycles and owns famous trademarks that are popular on clothing and other merchandise all over the world. For more than ten years, Harley-Davidson had a licensing agreement with a Greek company, Elmec Sport S.A., which was a subsidiary of defendant DFS. On January 1, 2010, Harley-

Davidson and Elmec reaffirmed this relationship in a trademark license agreement (the "Agreement"). Under the Agreement, Harley-Davidson permitted Elmec to use the "Harley-Davidson" and "Bar and Shield Logo" trademarks, among others, for Harley-Davidson-approved premium apparel products through Harley-Davidson-approved European distribution channels. The Agreement required Elmec to undergo a three-stage approval process prior to its release of any Harley-Davidson-branded products into the stream of commerce. Elmec had to submit to Harley-Davidson for review and written approval first all proposed concepts and artwork, then pre-production samples, and finally production samples.

Elmec sent Harley-Davidson a notice dated January 20, 2011 of "Merger of our Company with our parent company." The notice informed Harley-Davidson that Elmec and DFS would "from now on, trade as a single entity" and that DFS "acts as full successor of Elmec." In Elmec's words, "all the contracts that Elmec has entered into remain valid," and "this merger does not alter the ownership structure and/or the management of our company, and it shall not affect the business relationships between our two companies."

The Agreement gave Harley-Davidson the right to terminate it if Elmec went through a merger. Harley-Davidson did not not exercise that right. Instead, as it had promised, DFS just stepped into Elmec's shoes in its relationship with Harley-Davidson. It submitted pre-production samples to Harley-Davidson for approval,

exhibited Harley-Davidson-branded products, took orders, and met with Harley-Davidson to discuss future branded products at an annual Harley-Davidson dealer meeting. The same Harley-Davidson and DFS personnel continued to work together, and Harley-Davidson received DFS communications from e-mail addresses ending "@elmec.gr."

In April 2011, however, Harley-Davidson discovered that DFS had sold unauthorized products bearing the Harley-Davidson trademark to an unapproved German retailer, Penny Markt. Harley-Davidson learned of DFS's action because other European dealers of its licensed products complained, believing that the distribution of sub-par products to unauthorized retailers would harm the Harley-Davidson brand and their own businesses. Harley-Davidson had not approved in writing any pre-production samples or production samples of the Penny Markt goods. In fact, DFS had not submitted any for approval, and Harley-Davidson had previously rejected a product concept and artwork for DFS's "Essentials Collection," which included several proposed products that were similar to Penny Markt goods. Nor had Harley-Davidson approved Penny Markt as a retailer under the Agreement. On April 14, 2011, Harley-Davidson sent an e-mail to DFS saying that Harley-Davidson believed DFS was in "serious breach of your contract" because of the Penny Markt sales, and that Harley-Davidson was "suspending approval of any products in concept, pre-production, or production phases." DFS responded in kind, stating that it had "no option but to put on hold, as of today [April 15, 2011], all our dealings

with you under the Agreement of January 1st 2010." On April 22, 2011, Harley-Davidson faxed DFS a letter describing DFS's breaches of the Agreement and advising DFS that it was exercising its right to terminate the Agreement immediately.

Over the following months, Harley-Davidson attempted to recover unpaid royalties from DFS and to secure from DFS certain information required under the Agreement. DFS refused these attempts. Even though Harley-Davidson had suspended all DFS product approvals and DFS had put "on hold" its own dealings with Harley-Davidson, on July 22, 2011, DFS submitted production samples for the then-upcoming "Autumn/Winter 2011-2012" goods collection for Harley-Davidson's approval. Harley-Davidson did not review the samples, reminding DFS that its April 22, 2011 termination prohibited DFS from "designing, manufacturing, promoting, selling or distributing" any unauthorized products bearing Harley-Davidson trademarks. On July 28, 2011, DFS's counsel advised Harley-Davidson that it had "wrongfully repudiated the License Agreement" and that DFS planned to "act unilaterally in accordance with its own views of the parties' rights and obligations." That exchange lit the fuse of this litigation.

B. *Temporary Restraining Order*

Invoking the diversity jurisdiction of the federal courts under 28 U.S.C. § 1332(a)(2), Harley-Davidson filed this lawsuit in the Eastern District of Wisconsin for breach of contract against DFS on August 5, 2011, and on

August 12, 2011 moved for a temporary restraining order. DFS received copies of all papers filed with the district court through its U.S. counsel, but refused to accept formal service of process through counsel. On the day of the TRO hearing, the district court contacted DFS's U.S. attorney who had been speaking for DFS in negotiations with Harley-Davidson and who has represented DFS in these appeals. The attorney told the court that DFS did not wish to participate in the TRO hearing on Friday, September 2, 2011. On the next business day, Tuesday, September 6, 2011, the district court granted the TRO against DFS, setting the bond at $10,000.

One week later, on September 13, 2011, Harley-Davidson moved for an extension of the TRO beyond the initial 14-day time period provided by Federal Rule of Civil Procedure 65(b)(2) until DFS could be served with process under the Hague Convention and until a preliminary injunction hearing could be held. Harley-Davidson had initiated the process of effecting service on DFS in August and had been informed that service would likely take three to four months. The court granted Harley-Davidson's motion on September 19, extending the TRO "until plaintiffs have effected service on defendant pursuant to the Hague Convention." *H-D Michigan, LLC v. Hellenic Duty Free Shops, S.A.*, 2011 WL 4368418, at *2 (E.D. Wis. Sept. 19, 2011). In fact, service had taken only about a month. DFS had been served in Greece on September 13, 2011, less than a week after the district court issued the TRO. DFS did not appear in the district court until October 4, 2011, when it filed its answer.

On October 17, 2011, the district court held a telephonic status conference. The minutes of that conference reflect that the court offered to hold a hearing immediately on the continuation of the TRO or the issuance of a preliminary injunction. DFS requested 45 to 60 days to conduct discovery and to prepare for a hearing. The court granted DFS's request, scheduling the preliminary injunction hearing for December 15, 2011. It also asked DFS to submit any objections to the TRO and to submit evidence on the appropriate size of the bond within 10 days. In the meantime, though, the court ordered that the TRO would remain in effect over DFS's objection. Per the court's order, DFS moved to modify or vacate the temporary restraining order on October 27, 2011, arguing in part that the bond then in place was inadequate and that the district court did not have personal jurisdiction over DFS. Its motion to vacate was denied, but the court raised the amount of Harley-Davidson's injunction bond to $1 million. It was raised again on November 17, 2011, to $1.8 million.

C. *Preliminary Injunction*

On December 20, 2011, after a hearing five days earlier, the district court granted a preliminary injunction against DFS. The preliminary injunction remains in effect and prohibits DFS and "its employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, joint ventures, distributors, dealers, and all persons in active concert or participation with any of them who receive actual

notice by personal service or otherwise" from the fol-
lowing:

1.  Manufacturing, assembling, distributing, promoting,
    advertising and selling any products . . . and any
    other materials bearing any of the Licensed Trade-
    marks or variations thereof;

2.  Using any of the Licensed Trademarks or variations
    thereof in any manner on or in connection with
    any products . . . ;

3.  Representing by any means whatsoever, directly or
    indirectly, that defendant, any products offered by
    defendant, or any activities undertaken by defendant
    are sponsored or licensed by plaintiffs, or are other-
    wise associated or connected in any way with plain-
    tiffs, or that the Agreement is still in effect;

4.  Destroying, altering, secreting, transferring, or
    otherwise disposing of . . . any artwork, products,
    pre-production and production samples of
    products, means for making products, advertise-
    ments, promotional materials, sales and accounting
    records, letters, emails, files, and documents
    (whether on paper, in electronic format, or on any
    other medium) relating to: (a) the Licensed Trade-
    marks, (b) the Agreement, (c) the manufacture,
    sales or promotion of products bearing the
    Licensed Trademarks or variations thereof to or
    by Penny Market [sic] Grocery stores, (d) the manu-
    facture, sales, or promotion of products bearing
    the Licensed Trademarks or variations thereof to
    or by Real grocery stores, or (e) the claims and

allegations asserted by plaintiffs in their complaint in this action;

5.  Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 1 through 4 above.

*H-D Michigan, LLC v. Hellenic Duty Free Shops, S.A.*, 2011 WL 6385651, at *5 (E.D. Wis. Dec. 20, 2011).

### D.  *DFS's Greek Lawsuit and the Anti-Suit Injunctions*

In the meantime, DFS had filed a lawsuit against Harley-Davidson in Greece on November 15, 2011. While the district court's TRO was in place, and before the preliminary injunction was entered, DFS asked the Greek court to issue an injunction against Harley-Davidson that would (a) allow DFS to distribute freely the Autumn-Winter 2012 Goods that Harley-Davidson had refused to approve and (b) prohibit Harley-Davidson from disputing DFS's status as an authorized Harley-Davidson licensee. The record before us shows that DFS did not inform the U.S. district court or Harley-Davidson of the Greek lawsuit, nor did DFS tell the Greek court about the existence of the U.S. action or the TRO that conflicted directly with the relief it was seeking in the Greek lawsuit. Following an *ex parte* hearing on December 2, 2011, the Greek court issued a provisional order against Harley-Davidson permitting DFS to distribute the disputed Autumn-Winter 2012 goods. Harley-Davidson did not learn of DFS's Greek action until it was

served with the provisional order on January 18, 2012. Neither DFS nor its counsel advised the district court, Harley-Davidson, or its counsel of the Greek action despite many opportunities to do so between November 15, 2011 and January 18, 2012.[1]

On January 24, 2012, Harley-Davidson filed in the district court an "Emergency Motion for Preliminary Anti-Suit Injunction" seeking to compel DFS to withdraw its Greek lawsuit. Harley-Davidson also brought related petitions in Greece. On January 25 and 27, 2012, Harley-Davidson petitioned the Greek court: (a) to enforce the U.S. district court's December 20, 2011 injunction; and (b) to revoke the Greek court's injunction against Harley-Davidson that DFS had obtained *ex parte*. Harley-Davidson informed DFS's U.S. counsel of its Greek petitions by e-mail on January 30, 2012 after DFS had filed its opposition to Harley-Davidson's anti-suit injunction motion. Harley-Davidson informed the district court of its Greek actions on February 2, 2012 in its reply brief.

---

[1] DFS insists that it informed Harley-Davidson of the action by cable on November 25, 2011, and implies that the Greek court would not have issued a restraining order against Harley-Davidson unless it was reasonably assured that Harley-Davidson had been properly summoned. The parties apparently are attempting to verify what happened to the cable. For purposes of these appeals, whether Harley-Davidson received the November 25 cable is not important. DFS had many opportunities, both in and out of court, to inform Harley-Davidson and the district court of the DFS Greek lawsuit and repeatedly chose not to do so.

On February 7, 2012, the district court granted an anti-suit injunction motion. Its opinion described the DFS Greek action as "a blatant attempt by defendant to relitigate issues that I have already decided" and described Harley-Davidson's Greek action as "Plaintiff's effort to dismiss the parallel lawsuit by working through the Greek courts." *H-D Michigan, LLC v. Hellenic Duty Free Shops, S.A.*, 2012 WL 404895, at *4 (E.D. Wis. Feb. 7, 2012). Its order on Harley-Davidson's preliminary anti-suit injunction motion, entered separately, enjoined DFS from:

1. further prosecuting, litigating and/or proceeding by any means whatsoever with the Provisional Measure Procedure No. 141350 before the One-Member First Instance Court of Athens titled *Duty Free Shops Society Anonyme for the Exploitation of Duty Free Shops and Industrial, Manufacturing, Technical and Commercial Company S.A. v. Harley-Davidson Motor Company, Inc.* and any associated proceedings;

2. further prosecuting, litigating and/or proceeding by any means whatsoever with any actions, proceedings or lawsuits before any court or agency in any country or territory outside of the United States that contradict, impair, or otherwise affect this Court's rulings, including the December 20, 2011 preliminary injunction order, and/or this Court's jurisdiction to adjudicate the present action;

3. from filing or otherwise initiating any other actions . . . before any court or agency in any country or territory outside of the United States that

contradict, impair, or otherwise affect this Court's
rulings, including the December 20, 2011 preliminary
injunction order and/or this Court's jurisdiction to
adjudicate the present action.

Dkt. 97 at 3-4.

Meanwhile, Harley-Davidson's Greek petitions were
scheduled to be heard in the First Instance Court of Athens
on February 17, 2012. On February 10, DFS filed in our
court a motion to stay the district court's anti-suit injunc-
tion order pending appeal. We denied the motion. DFS
then petitioned the district court for a stay, con-
tending that a stay "would not interfere at all with
Harley-Davidson's right and ability to argue to the First
Instance Court that it should 'recognize' and enforce, in
Greece, a provisional non-final injunctive order of this
court notwithstanding DFS's pending appeals and as
yet unlitigated jurisdictional and other defenses to
liability or specific performance as a remedy."

DFS's motion to stay was still pending in the U.S. district
court when the hearing on the Harley-Davidson Greek
petitions went forward in Greece. DFS appeared and
actively opposed Harley-Davidson's petitions. In the
Greek court, it contested both the jurisdiction and the
substance of the U.S. district court's December 20,
2011 preliminary injunction. On February 20, 2012, the
Greek court granted Harley-Davidson's motion for a
temporary order enforcing the U.S. district court's Decem-
ber 20 preliminary injunction and revoked its own pro-
visional order in the DFS Greek action. The Harley-
Davidson Greek petitions remain pending in the

First Instance Court of Athens, with a final hearing sched-
uled for September 21, 2012.

Apparently unaware that the Greek court had granted
Harley-Davidson's motion for a temporary order and
revoked its prior order in favor of DFS two days earlier,
on February 22, 2012, the district court denied DFS's
motion to stay the February 7 anti-suit injunction. The
district court found that DFS had failed to demonstrate
that the anti-suit injunction could harm international
relations between the United States and Greece or that
DFS could be irreparably harmed. "Regardless of what
the Greek court does, defendant is bound by the pre-
liminary injunction because defendant is a party to
this lawsuit and is subject to personal jurisdiction in
this court." The court also noted: "While *the injunction
does prohibit defendant from opposing plaintiff's efforts to
enforce in Greece the preliminary injunction* I issued on
December 20, 2011, these efforts cannot cause meaningful
harm to defendant." Dkt. 113 at 2 (emphasis added).

II. *Analysis*

DFS mounts several arguments in its appeals of the
temporary restraining order, the preliminary injunction,
and the anti-suit injunction. Its principal argument is
that the district court in Wisconsin had no personal
jurisdiction over DFS, which had not signed the Harley-
Davidson/Elmec Agreement in which Elmec had agreed
to jurisdiction and venue in Wisconsin. We address this
issue first and agree with the district court that DFS
became a party to the Agreement through its merger

with Elmec. We then turn to DFS's narrower challenges to the TRO, then the preliminary injunction, and finally the anti-suit injunctions. We affirm all of the district court's orders.

A. *Personal Jurisdiction*

DFS's broadest challenge is that the U.S. district court in Wisconsin had no personal jurisdiction over it and thus could not issue binding injunctions. DFS is a Greek corporation with its principal place of business in Attica, Greece. It has no offices, employees, representatives, or property in Wisconsin, and it is not registered to do business in Wisconsin. It does not market or sell any goods or services in Wisconsin. But in January 2011, DFS merged with its subsidiary Elmec, with DFS as the surviving entity. Under the merger, Elmec's assets became the assets of DFS. One of those assets was the Harley-Davidson/Elmec Agreement, with its attendant rights and obligations. Section 16.2 of the Agreement provided that the federal and state courts in Wisconsin were to have exclusive jurisdiction over all disputes "arising out of or relating to this Agreement," and that Elmec explicitly consented to personal jurisdiction in Wisconsin with respect to "disputes between the parties" to the Agreement. The issue is whether, when Elmec and DFS merged, DFS assumed and can be bound by Elmec's consent to jurisdiction in Wisconsin.

In licensing agreements for trademarks and other intellectual property, the licensor generally wants to maintain control of the intellectual property. One impor-

tant means for doing so are restrictions on the licensee's ability to transfer or assign its rights under the license to third parties who may be unknown or even hostile to the licensor. The Harley-Davidson/Elmec Agreement contained several such provisions. We focus first on the language that addressed most specifically the consequences of a merger or other change of control of the licensee. Section 10.1(c), which we call the merger provision, said in relevant part:

> If any of the following Triggering Events occur, [Harley-Davidson] *shall have the option*, in its sole and exclusive discretion, *to immediately terminate this Agreement by sending written notice of termination* to Licensee . . . :
>
> (i) Any *merger*, consolidation, acquisition, change of ownership, control or management involving Licensee occurs; or
>
> (ii) Any of the principal assets of Licensee that are required for the conduct of its business are transferred, by operation of law, merger, consolidation, issuance or re-issuance of shares, or otherwise.

(Emphases added.) Harley-Davidson received notice of the DFS-Elmec merger and did not exercise its option to terminate the Agreement. Under section 10.1(c), the Agreement remained in effect with DFS as licensee with all of Elmec's rights and obligations.

This conclusion, based on the plain language of section 10.1(c), is consistent with DFS's own words and actions after the merger. Upon the event of the merger,

Elmec assured Harley-Davidson by notice dated January 20, 2011, that, "legally, HELLENIC DUTY FREE SHOPS S.A. — FOLLI FOLLIE GROUP acts as full successor of Elmec Sport S.A. Therefore, all the contracts Elmec has entered into remain valid." Although Elmec asked Harley-Davidson to acknowledge the merger, Harley-Davidson did not respond. It certainly did not exercise its option under section 10.1(c) to terminate the agreement. After the merger, neither Harley-Davidson nor DFS made any effort to amend the Agreement or its consent-to-jurisdiction clause. DFS itself insisted that the Agreement was still effective and binding when its counsel wrote a July 28, 2011 letter asserting that DFS could enforce the Harley-Davidson/Elmec "License Agreement." ("You will appreciate that [DFS] considers that [Harley-Davidson] has wrongfully repudiated the License Agreement and is in no position to be making any demands on DFS whatsoever . . . . DFS will act unilaterally in accordance with its own views of the parties' rights and obligations.")[2] Based on these facts, Harley-Davidson argued, and the district court found, that the effect of the DFS-Elmec merger was to bind DFS to the terms of the Agreement, including Elmec's consent to jurisdiction in Wisconsin.

---

[2] The author of the letter was Mr. Dabney, who argued the case before this court. His assertion at oral argument that his reference to the "License Agreement" in the July 28 letter was to some other agreement was neither credible nor in keeping with counsel's professional duty of candor to the court.

To avoid this application of the merger provision, consistent with the parties' actions, DFS has argued that the Agreement was completely voided by the DFS-Elmec merger and that the parties' relationship after the merger was not governed by any written agreement. The theory in the litigation, which is not consistent with any of DFS's earlier actions or statements, including its counsel's letter of July 28, 2011, is that the effect of the DFS-Elmec merger was governed not by the merger provision in section 10.1(c) but by a different, broader provision, section 14, which provided:

> This Agreement and all rights and obligations hereunder are personal to Licensee and may not be assigned, sublicensed, encumbered, or otherwise transferred, in whole or in part, by Licensee without the prior written consent of Licensor, which consent shall be in Licensor's sole and exclusive discretion. . . . Any attempt by Licensee to do any of the foregoing shall be void *ab initio* and shall constitute a material breach of this Agreement.

Citing *Menenberg v. Carl R. Sams Realty Co.*, 59 N.W.2d 125, 127 (Mich. 1953), DFS contends that Elmec's rights and obligations under the Agreement were personal to Elmec, and that under applicable law, personal contracts and obligations cannot be transferred to a third party. The theory is that when Elmec and DFS merged without prior written consent of Harley-Davidson under section 14, the merger voided the Agreement altogether because the DFS-Elmec merger fell under section 14's broad and comprehensive ban of "assign[ments]" and "other[ ] transfer[s]."

In support of its position, DFS relies on a handful of distinguishable cases and an affidavit of University of Michigan Law Professor James J. White, who has opined that the DFS-Elmec Agreement "does not impose any obligations on DFS and does not obligate DFS to litigate any claims in Wisconsin." We disagree.

Because this issue turns on a question of contract interpretation, our review is *de novo*. See *Digitech Computer, Inc. v. Trans-Care, Inc.*, 646 F.3d 413, 417 (7th Cir. 2011). Accordingly, we examine the language of the Agreement and interpret its terms under well-established principles of contract construction under Michigan law. Under Michigan law, the goal of contract interpretation is to read the document as a whole and to apply the plain language used to honor the intent of the parties. See *Dobbelaere v. Auto-Owners Ins. Co.*, 740 N.W.2d 503, 505 (Mich. App. 2007). We must enforce the clear and unambiguous language of a contract as it is written. See *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999).

We agree with the district court and find under Michigan law that the general provisions of section 14 do not control where the more specific terms of section 10.1(c) apply to the merger by Elmec. DFS is bound by the Agreement and is subject to personal jurisdiction in Wisconsin under the Agreement's clause consenting to jurisdiction in Wisconsin.[3]

---

[3] In addition to finding section 10.1(c) controls, we also find DFS precluded by equitable principles of waiver and estoppel

(continued...)

The governing principles of contract interpretation are familiar: that the more specific provision governs where there is an arguable conflict with a more general provision, see *Royal Property Group, LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 434 (Mich. App. 2005), citing *Sobel v. Steelcraft Piston Ring Sales, Inc.*, 292 N.W. 863, 867 (Mich. 1940); 11 Williston on Contracts § 32:10 (4th ed.), and that the contract should be interpreted to avoid rendering any provision superfluous, see *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003); *Royal Property Group*, 706 N.W.2d at 432 (citing *Klapp*).

Reading the Harley-Davidson Agreement with Elmec as a whole, section 10.1(c) provided a clear exception — for mergers — to the more general language of section 14. Section 10.1(c) gave Harley-Davidson the option to terminate the Agreement in the event of a "merger, consolidation, acquisition, or change of ownership, control, or management." Section 14 did not refer to mergers. Instead, it generally stated that rights and obligations under the Agreement "may not be assigned, sublicensed,

---

[3] (...continued)

from arguing that its merger with Elmec triggered the anti-assignment clause. After the merger, DFS told Harley-Davidson that the Agreement remained in effect, and Harley-Davidson could reasonably rely on that assurance as long as Harley-Davidson did not exercise its option to terminate. Moreover, DFS acted so as to take advantage of the license granted under the Agreement but, in litigation, is attempting to disavow its corresponding obligations under the same Agreement.

encumbered or otherwise transferred . . . without prior written consent of Licensor." Simply put, section 10.1(c) addressed specifically the effects of a corporate merger. Section 14 did not. Therefore, when Elmec merged into DFS, section 10.1(c) of the Agreement governed the parties' rights and obligations. Section 14 did not.

When DFS and Elmec joined, the "Merging Announcement" informed Harley-Davidson that the "merging procedures" between Elmec and DFS were complete and that "this merger does not alter the ownership structure and/or the management of our company, and it shall not affect the business relationships between our two companies." After Harley-Davidson received notice of the merger announcement, it did not exercise its option to terminate the agreement pursuant to section 10.1(c). Consistent with DFS's own words and actions at the time, the Agreement therefore remained in effect after the merger and was binding on DFS. Our conclusion is consistent with the Agreement as a whole, renders no provision of the Agreement superfluous, and is consistent with Michigan law. See Mich. Comp. Laws § 450.1724(1)(b) ("the title to all real estate and other property and rights owned by each corporation party to the merger are vested in the surviving corporation without reversion or impairment.").

These principles rebut DFS's arguments. DFS would make the general provision for attempted assignments and transfers of the license override the more specific provision for mergers by the licensee. DFS would also render section 10.1(c) superfluous, for its more specific provisions would have no effect if the general provi-

sions of section 14 were to govern. DFS runs into another problem. Contrary to DFS's argument, section 14 does not mean that an attempt by Elmec to transfer or assign its rights and duties renders *the underlying Agreement* void as a whole. Section 14 provides instead that an attempted transfer or assignment, done without Harley-Davidson's permission, would be void *ab initio* — not that the underlying Agreement itself would be void. The attempted transfer would be void but would leave the Agreement in place, so that even if section 14 were triggered, Elmec would remain a party to the Agreement, and would remain subject to its duties under the Agreement. Elmec is now DFS, so DFS would be bound in Elmec's stead.

The license granted by the Agreement was, at every turn, Harley-Davidson's to control, define, and limit. See Agr. § 4.2(a) (requiring licensee to go through a three-stage approval process and obtain Harley-Davidson's written approval at each stage before releasing any Harley-Davidson-branded products under the Agreement); Agr. Exhibit A (list of Harley-Davidson-approved distribution channels); Agr. § 1.3 (requiring licensee to obtain Harley-Davidson's written approval for any distribution channels other than those listed in Exhibit A). Under section 10.1(c), Harley-Davidson retained this control in the event that licensee Elmec merged with another entity.

DFS's contention that section 14 trumped section 10.1(c) would improbably shift the contractual balance of

power out of Harley-Davidson's control and into DFS-Elmec's. Harley-Davidson would no longer have the option, in its sole discretion, to terminate in the event of a merger — an option that is clearly set forth by section 10.1(c). Instead, DFS's reading would give licensee Elmec the unilateral power to terminate the Agreement simply by redefining itself as another entity, yet also, improbably, continuing to enjoy the trademark license granted in the supposedly void Agreement. (Here Elmec accomplished that result through merger with DFS, but its argument does not foreclose the possibility that it could have unilaterally scuttled the contract based on a mere change in management, also a "triggering event" listed in section 10.1(c).) No other provision of the Agreement gave that level of control to DFS-Elmec.

Contrary to DFS's argument, our finding that section 10.1(c) controlled corporate mergers does not make the license granted by Harley-Davidson any less "personal" — a contractual understanding that must itself be read in the context of the entire Agreement. The case on which DFS relies — *Menenberg v. Carl R. Sams Realty Co.*, 59 N.W.2d 125, 127 (Mich. 1953) — applies to the dissolution of a partnership and is not apposite to a corporate merger. See *id.* (discussing "rule that the dissolution of a real estate brokerage partnership terminates its authority to sell real estate which had been placed in its hands for that purpose"). Professor White also puts forth this theory, but the case on which he relies is similarly distinguishable, and inapplicable.

See White Aff. at 3, citing *Detroit Postage Stamp Service Co. v. Schermack*, 146 N.W. 144, 147 (Mich. 1914) (contract by which defendants granted plaintiff's assignor an exclusive agency for the sale of merchandise involved a personal relationship that could not be assigned without defendant's consent; assignee never undertook obligations under the contract and therefore could not enforce it). This argument is not persuasive, is without meaningful case support and runs contrary to the principles of contract interpretation discussed above. However personal Elmec's rights and obligations were under the Agreement, its merger into DFS did not upend the Agreement. The merger merely gave Harley-Davidson an option to terminate, which it did not exercise. The Agreement remained in effect, and the surviving entity from the merger, DFS, became the licensee under it — just as DFS said at the time of the merger — and thus became subject to jurisdiction in Wisconsin.

DFS relies on a number of cases interpreting provisions similar to the Agreement's section 14 "transfer" provision. None of these cases involved a contract with a more specific provision like the merger provision in the Harley-Davidson Agreement with Elmec, and in none of these cases was a licensee permitted to avoid its obligations by merging with another entity. In sum, DFS cites no relevant authority to support its extraordinary position that in the face of a generalized "assignment" provision and a specific "merger" position, the general assignment provision would control the parties' rights and obligations in the event of a corporate

merger, such that a licensee could avoid its contractual obligations through a corporate merger.[4]

---

[4] We need not address them all individually, but DFS's host of inapposite authority includes *Pro-Edge L.P. v. Gue*, 419 F. Supp.2d 1064, 1082-85 (N.D. Iowa 2006) (employment agreement containing covenant not to compete was not excluded from asset transfer in corporate restructuring; contract did not define "assignment" or provide an exception in the event of a change in corporate structure); *Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., Inc.*, 2007 WL 1541877, at *5 (M.D. Tenn. May 23, 2007) (anti-assignment clause in joint venture agreement prevented transfer of agreement to surviving entity after merger; contract's anti-transfer provision prohibited transfers voluntarily or by "operation of law," and did not define transfer or otherwise provide an exception for corporate mergers); *Laforest v. Honeywell Int'l, Inc.*, 2004 WL 1925490, at *5-6 (W.D.N.Y. Aug. 27, 2004) (party's contractual obligations could not have been assigned because anti-assignment clause required prior written consent to transfer and no prior consent was obtained; contract did not contain merger provision); *Parks v. CAI Wireless Sys., Inc.*, 85 F. Supp. 2d 549, 554-55 (D. Md. 2000) (denying defendants' motion for summary judgment on claims of constructive fraud and breach of contract; contract did not define assignment or transfer or exempt corporate mergers, so defendants' corporate merger triggered assignment clause requiring plaintiff's interest in joint venture to be sold or assigned on identical terms); *SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458, at *3-6 (N.D. Cal. Dec. 18, 1991) (consistent with federal copyright law, anti-assignment clause prohibited transfer of non-exclusive copyright license to surviving entity after corporate merger; contract did not define assign-

(continued...)

DFS relies most heavily on two federal court decisions. In *Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431 (6th Cir. 2009), the Sixth Circuit examined a software license agreement that included a general provision that the licensee could "not transfer its rights or obligations under this Agreement without the prior written approval of [licensor] Cincom." *Id.* at 434. The Sixth Circuit affirmed the district court's conclusion that the licensee's merger was a violation of the contract's anti-assignment provision. The court wrote: "the plain text of the license is clear. No transfers are permissible without express written approval." *Id.* at 437. If we were interpreting section 14 of the Harley-Davidson/ Elmec Agreement in a vacuum, *Cincom* would tell us that an attempted transfer of the license from Elmec to DFS would be void, but the contract in *Cincom* did not contain a separate merger provision comparable to section 10.1(c) in the Harley-Davidson/Elmec Agreement. Accordingly, *Cincom* offers little direct guidance. (The *Cincom* court affirmed summary judgment in favor of the copyright owner holding that the result of the attempted transfer of license was that the license was void and the defendant had infringed the copyright.)

---

[4] (...continued)

ment or contain a provision specifically governing merger); *Nicholas M. Salgo Assocs. v. Continental Illinois Props.,* 532 F. Supp. 279, 282-83 (D.D.C. 1981) (partial summary judgment granted in favor of plaintiff based on its argument that partner's merger without plaintiff's consent violated anti-assignment clause in partnership agreement; partnership agreement did not except mergers).

Similarly, *Hy King Associates, Inc. v. Versatech Manufacturing Industries, Inc.*, 826 F. Supp. 231 (E.D. Mich. 1993), involved a contract that prohibited the "assign[ment] or transfer [of] this agreement or any rights or obligations hereunder except with the prior written consent" of Versatech. *Id*. at 233. King signed the contract as an individual but later incorporated his sales business. The question was whether the incorporation was a triggering event under the assignment provision. The court held that it was, finding that under the plain language of the agreement, Versatech's written consent was a condition precedent to a valid assignment, so there could be no contractual relationship between the parties. *Id*. at 238-39. Like *Cincom*, *Hy King* interpreted a contract that included a general assignment clause but not a more specific merger clause. These cases therefore offer no useful guidance for interpreting the Harley-Davidson/Elmec Agreement in which the parties included a provision separate from the anti-assignment provision that explicitly dealt with mergers.

Although dicta, language found in *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090 (6th Cir. 1979), provides more relevant guidance. *PPG* involved two glass fabrication companies that had developed a new industrial process for shaping glass for various commercial uses. PPG granted a patent license that was personal to the licensee and "non-assignable except with the consent of PPG first obtained in writing." *Id*. at 1092. The licensee (Permaglass) then merged with Guardian, a corporation that manufactured automobile windshields. If Ohio state law had applied, PPG's

licenses would have automatically transferred from Permaglass to Guardian as part of the merger. The Sixth Circuit, however, concluded that federal law governed the assignment of a patent license and that a license is presumed to be non-assignable and non-transferable "in the absence of express provisions to the contrary." *Id.* at 1095. "If the parties had intended an exception in the event of a merger, it would have been a simple matter to have so provided in the agreement." *Id.*, citing, *e.g.*, *Packard Instrument Co. v. ANS, Inc.*, 416 F.2d 943, 944 n.1 (2d Cir. 1969) (license agreement provided that rights thereunder could not be transferred or assigned "except . . . if the entire ownership and business of ANS is transferred by sale, merger, or consolidation"); *Freeman v. Seiberling Rubber Co.*, 72 F.2d 124, 125-26 (6th Cir. 1934) (license was not assignable except with the entire business and good will of the licensee). The parties in *PPG* did not expressly provide for merger, so the anti-assignment clause governed. Harley-Davidson and Elmec, on the other hand, did expressly provide for their respective rights and obligations in the event of a merger, and that provision, section 10.1(c), governs the outcome and secured the Wisconsin court's jurisdiction over DFS.

DFS assumed the Agreement as an asset after the DFS-Elmec merger. That was made plain to Harley-Davidson when DFS confirmed that "all the contracts Elmec has entered into remain valid" and that "the merger does not alter the ownership structure and/or the management of our company, and it shall not affect the business relationship between our two companies."

DFS cannot now escape its obligations by redefining that transaction as a "transfer" or "assignment" instead of what it was, a corporate merger that, under the terms of the Agreement, had no impact on the Agreement without Harley-Davidson's written objection. When Harley-Davidson did not object to the merger, DFS assumed Elmec's rights and obligations under the contract, including its consent to personal jurisdiction in Wisconsin. The district court had and still has personal jurisdiction over DFS.

B.  *The Temporary Restraining Order*

With personal jurisdiction secure, we turn to DFS's attacks on the merits of the district court's orders. DFS appeals several aspects of the temporary restraining order that was first issued by the district court on September 6, 2011 and then modified on November 7 and 17. Although the TRO was superseded by a preliminary injunction entered on December 20, 2011, these issues remain ripe for review. See *Groupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 313-18 (1999) (plaintiffs' eventual victory on the merits did not render moot the question of whether the preliminary injunction had properly issued; provisional remedy was not necessarily justified by defendant's contractual liability); *American Can Co. v. Mansukhani*, 742 F.2d 314, 320-21 (7th Cir. 1984) (validity of TRO reviewed after it had been superseded by later preliminary injunction; TRO had caused injury to defendant prior to preliminary injunction hearing). On appeal we

"review the [district] court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011); *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). We address DFS's arguments against the TRO in the order in which they were presented.

### 1. *Service of Process*

DFS's first argument is preposterous. It argues that the district court erred by issuing the TRO prior to formal service of process or the appearance of DFS's counsel. The argument is refuted by the plain language of Rule 65, which permits the issuance of a preliminary injunction "only on notice," or the issuance of a temporary restraining order in some cases without "written or oral notice to the adverse party or its attorney." Fed. R. Civ. P. 65(a), (b)(1). The case on which DFS relies — *Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350-51 (1999) — dealt with deadlines for removal to federal court, not TROs. It has nothing to do with Rule 65. In fact, DFS and its counsel had actual notice of the hearing on Harley-Davidson's motion for a TRO and chose not to participate. That was their right, but their choice did not deprive the court of the power to issue a TRO. Moreover, because formal service of process under the Hague Convention or other provisions of law can take months, acceptance of DFS's argument would have the unfortunate effect of immunizing most foreign defendants from needed emergency injunc-

tive relief. There is a reason Rule 65 allows emergency injunctive relief before service of process, and this case provides a good example.

## 2. *Parties Bound*

Next, DFS argues that the district court's temporary restraining order was impermissibly broad, going beyond Rule 65(d)(2)'s directive that the order may bind only parties, the parties' officers, agents, servants, employees, and attorneys, and "other persons who are in active concert or participation with [the foregoing persons]." By its terms, the TRO bound not only DFS and its various categories of agents, but also DFS's "distributors, dealers, and all persons in active concert or participation with any of them." DFS's argument runs headlong into our precedent, which holds that the district court has broad authority under Rule 65 to enjoin third parties who receive appropriate notice of the court's injunctive order. "Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum. Jurisdiction over persons who knowingly violate a court's injunctive order, even those without any other contact with the forum, is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process." *SEC v. Homa*, 514 F.3d 661, 674-75 (7th Cir. 2008) (internal quotations omitted). Given

the district court's familiarity with these parties and their dispute, we defer to its discretionary judgment that the broad language it used was necessary to give effect to its order. Should any non-party believe that it has been enjoined improperly, it is free to seek a modification or clarification from the district court, which might be able to consider whether, for example, a dealer or distributor would qualify as an agent of DFS. At this juncture, however, and without any showing that the rights of any non-party have been infringed, DFS's argument fails.

3. *"Reasonable Detail"*

An order granting a preliminary injunction or restraining order must "describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). DFS argues that the TRO violated this provision by improperly describing the enjoined acts "by reference to a definition of the capitalized term 'Licensed [Trademarks]' as it appeared in the [Harley-Davidson]/Elmec Agreement," which was under seal at the time.[5] But the injunction must also be broad enough to be effective. The appropriate scope of the injunction

---

[5] DFS's brief refers to the phrase "Licensed Products" instead of "Licensed Trademarks." Because the court's TRO did not use or define the phrase "Licensed Products," we presume that DFS meant "Licensed Trademarks," which is defined by the district court in the TRO. For our purposes the particular term is not important.

is best left to the district court's sound discretion, because the district court is in the best position to weigh these interests. See *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) (injunction that potentially enjoined legal conduct upheld; defendant had demonstrated proclivity for unlawful conduct and for violating court's orders, warranting a broadly-worded order) (collecting cases). Although the district court's TRO did not explicitly define the term "Licensed Trademarks," the term's reference to Harley-Davidson trademarks is sufficiently plain from the document. DFS does not argue that it suffered from any confusion or uncertainty concerning the definition of "Licensed Trademarks" or any other aspect of the district court's language. Nor has DFS asked the district court to modify or clarify the order. See, *e.g.*, *Russian Media Group*, 598 F.3d at 308 (inviting defendants to seek modification of injunction from district court if they desired to engage in legal conduct that would otherwise violate the order). Accordingly, we find that the district court's TRO satisfied Rule 65(d)(1)(C)'s requirement that it "describe in reasonable detail . . . the act or acts restrained," and that the broad scope of the order was not an abuse of the district court's discretion.

### 4. *28-Day Limit*

DFS next challenges the district court's extensions of its TRO. Harley-Davidson first moved for a TRO on August 12, 2011. DFS refused to accept service. When its counsel was contacted by the court on September 2,

the day of the TRO hearing, DFS chose not to participate. The TRO was entered on September 6, and was set to expire after 14 days. DFS was served on September 13. On September 19, unaware that DFS had already been served, the court extended the TRO until Harley-Davidson effected service on DFS pursuant to the Hague Convention. Although it did not set a definite expiration date, the court's order anticipated that process could take three to four months. However, DFS appeared in the district court on October 4, making clear to both Harley-Davidson and the court, at least as of that date, that it had been served. On October 17, the court held a telephonic status conference. The court stood prepared to hold a preliminary injunction hearing immediately, but DFS requested 45 to 60 days to conduct discovery and to prepare. Accordingly, and per DFS's request, the hearing was set for December 15, 2011, and once the hearing was held, the court entered a preliminary injunction, complete with the necessary findings of fact and conclusions of law, on December 20.

On appeal DFS argues that the TRO the court entered on September 6, 2011 was facially void and subject to being vacated because it was "indefinitely extended" by the district court, first on September 19 to allow Harley-Davidson to effect service, and again at the October 17 status conference pending the preliminary injunction hearing. Rule 65 dictates that under ordinary circumstances a temporary restraining order cannot exceed 14 days, although the court may extend it "for a like period" for good cause. Fed. R. Civ. P. 65(b)(2).

In granting the extension on October 17, the district court cited cases asserting that a district court could extend a TRO for more than 20 (now 28) days to provide the parties adequate time to prepare for a preliminary injunction hearing, see, *e.g.*, *Trefelner v. Burrell School Dist.*, 655 F. Supp. 2d 581, 598-99 (W.D. Pa. 2009), and some district courts have taken the approach that the 20- and 28-day limits do not apply if the TRO was issued with notice to the enjoined party. See 11A Wright & Miller, Federal Practice and Procedure § 2953 at 280-83 (2d ed. 1995) (rejecting notice argument but suggesting that extensions are appropriate if needed to prepare for hearing). In our view, the language of Rule 65(b)(2) and the great weight of authority support the view that 28 days is the outer limit for a TRO without the consent of the enjoined party, regardless of whether the TRO was issued with or without notice. See *Sampson v. Murray*, 415 U.S. 61, 86-88 (1974); *Nutrasweet Co. v. Vit-Mar Enterprises, Inc.*, 112 F.3d 689, 692 (3d Cir. 1997); *Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n*, 306 F.2d 840, 842-43 (2d Cir. 1962); *Connell v. Dulien Steel Products, Inc.*, 240 F.2d 414, 417 (5th Cir. 1957).

If a court fails either to extend the TRO or to issue a preliminary injunction in its place, the TRO expires at the close of the 28-day period. "Where a court intends to supplant such an order with a preliminary injunction of unlimited duration pending a final decision on the merits or further order of the court, it should issue an order clearly saying so. And where it has not done so, a party against whom a temporary restraining order

has issued may reasonably assume that the order has expired within the time limits imposed by Rule 65(b)." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 444-45 (1974) (defendant could not be held in contempt for violating TRO that was silent on its face as to its intended duration; without either extension of TRO or issuance of preliminary injunction, TRO could be presumed to have expired as of Rule 65(b) time limit).

DFS argues that the *Granny Goose Foods* rule should apply here because the extensions of the TRO were indefinite. We disagree. The extensions were not silent about duration. The September 19 extension was until DFS was served under the Hague Convention, which had already happened on September 13 (though Harley-Davidson and the district court apparently did not know that until October 4). The October 17 extension stated the TRO would remain in effect until a decision on the motion for preliminary injunction, which occurred on December 20.[6]

---

[6] We do find a gap, however, between October 4 and October 17. By the terms of the district court's September 19 extension, the TRO lasted "until" DFS was served — or, on this record, until October 4, when it became clear to Harley-Davidson and the court that DFS had been served. The gap appears to have been inconsequential. This record does not demonstrate that any activity occurred either on the docket or between the parties between the short gap in time between October 4 and October 17, when the court effectively

(continued...)

When a TRO is extended beyond the 28-day limit without the consent of the enjoined party, it becomes in effect a preliminary injunction that is appealable, but the order remains effective. See *Sampson v. Murray*, 415 U.S. at 86-88 (where court expressly extends a TRO issued after notice and a hearing beyond the statutory limit, the TRO does not cease to exist but instead becomes an enforceable preliminary injunction subject to appellate review); *Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 496 F.3d 769, 771 (7th Cir. 2007) ("A temporary restraining order that remains in force longer than 20 days [now 28 days] must be treated as a preliminary injunction, which allows an appeal under 28 U.S.C. § 1292(a)(1)."); *Chicago United Indus. Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006) ("A temporary restraining order . . . if kept in force by the district court for more than 20 [now 28] days without the consent of the parties, . . . is deemed a preliminary injunction and so is appealable."); *In re Criminal Contempt Proceedings Against Crawford*, 329 F.3d 131, 135-37 (2d Cir. 2003) (analyzing interplay between *Granny Goose Foods* and *Sampson* in rejecting defendants' argument that TRO automatically expired at end of Rule 65(b)(2) time period; TRO had been explicitly extended by district court and defendants could be held in criminal contempt for violating its terms).

---

[6] (...continued)

revived the terms of the September 6 order and extended it until the preliminary injunction motion was decided.

We take a moment to remind district courts that for a TRO to be viable beyond the 28-day mark as a preliminary injunction, the order must comport with the formal requirements for a preliminary injunction. Rule 65(d) requires both a TRO and a preliminary injunction to "state the reasons why it issued," and Rule 52(a)(2) requires a statement of findings of fact and conclusions of law for decisions granting or refusing an "interlocutory injunction" (a phrase that includes preliminary injunctions). TROs issued on an emergency basis often provide only terse explanations. When a district court is considering extending a TRO beyond the 28-day limit, it would be prudent to review the explanation given to support the original order and to consider whether a further explanation may be appropriate to allow meaningful appellate review, as opposed to opening the order up to being vacated and remanded for lack of a sufficient explanation.

We recognize there will be cases where the maximum 28-day limit does not give the parties sufficient time to prepare for a preliminary injunction hearing, let alone time for the district court to decide it. In those cases, an extension of the TRO pending a preliminary injunction hearing and decision without consent of the enjoined party is technically a preliminary injunction: it is appealable, and the district court should provide a sufficient explanation of its decision to allow meaningful appellate review. See Fed. R. Civ. P. 52(a)(2). A court reviewing such an order for an abuse of discretion should take into account the urgency with which it was issued and the needs of the district

court and the parties, but the law does not allow an indefinite and unreviewable extension of a TRO without the consent of the enjoined party. See *Sampson*, 415 U.S. at 86-88; *Granny Goose Foods*, 415 U.S. at 441.[7]

The district court's September 6 TRO provided a short explanation that was not supplemented until the preliminary injunction was issued. If either party had thought the original explanation was not sufficient under Rule 52(a)(2) or Rule 65(d)(1)(A), it could have raised the issue and the court could have corrected any oversight very quickly. DFS did not raise such an issue before the district court or on appeal and has waived any argument it might have made in that regard. See *United States v. Johns*, 686 F.3d 438, 449 (7th Cir. 2012) (defendant waived argument by failing to present it on appeal); *Kunz v. DeFelice*, 538 F.3d 667, 681 (7th Cir. 2008) ("Failure to adequately present an issue to the district court waives the issue on appeal.").

## C. *Preliminary Injunction*

DFS argues that the preliminary injunction suffers from the same Rule 65 issues as the temporary restraining

---

[7] Another situation that can cause extraordinary urgency is the removal of a case to federal court shortly before the outer time-limit for a state-issued TRO will expire. *E.g., Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919, 921-22 (S.D. Ind. 2008), *aff'd*, 582 F.3d 721 (7th Cir. 2009).

order. For the reasons set forth above, we reject those arguments. It also argues that the preliminary injunction should be vacated because the relevant facts are hotly disputed by the parties and because the parties have raised "novel and uncertain questions of law." DFS Br. 43-45, citing *General Electric Co. v. American Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) (where issues of fact are conflicting, an injunction should not issue without an evidentiary hearing). Its argument is without merit. *General Electric* is inapposite here because DFS raises no argument that the evidentiary hearing afforded by the district court was in any way inadequate. (DFS agreed with Harley-Davidson in advance of the preliminary injunction hearing that neither side would present live testimony and that the court should decide the motion on the affidavits and other papers of record.) Requests for injunctive relief that present sharply contested facts are routine in the federal courts. The "novel and uncertain" questions of law DFS raises — whether section 14 or 10 of the contract applies to a corporate merger, whether Greek law would deem Harley-Davidson's trademark rights "exhausted," and whether only nominal damages are warranted under Michigan law — are issues of contract interpretation, nothing more, and are neither novel nor particularly uncertain. More important, though, the courts are equipped to handle both contested facts and novel legal questions. Neither poses a categorical bar to a preliminary injunction. DFS's arguments otherwise fail, and we affirm the district court's December 20, 2011 preliminary injunction against DFS.

D. *Anti-Suit Injunction*

Finally, DFS argues that the district court overstepped its equitable authority in its February 7, 2012 anti-suit injunction order by enjoining DFS from defending itself against Harley-Davidson's Greek petitions. Its argument is belied by its contrary assertion that the February 7, 2012 order of the district court "does not clearly or expressly" prohibit DFS from "defending" itself against Harley-Davidson's Greek petitions. DFS Br. 48. What that order did was prevent DFS from litigating in another action in a manner that would "contradict, impair, or otherwise affect this Court's rulings, including the December 20, 2011 preliminary injunction order, and/or this Court's jurisdiction to adjudicate the present action." The district court's language does not specifically mention the Harley-Davidson Greek petitions, nor does it explicitly prevent DFS from "defending" itself in those actions or any others except to the extent that DFS's defense would "contradict, impair, or otherwise affect" the December 20 preliminary injunction. At this stage in the proceedings, that lack of specificity is not particularly surprising. Harley-Davidson filed its motion for an anti-suit injunction on an emergency basis. At the time, little information was available concerning the Greek actions. Even with full information, there would have been little time to gather and process that information on an expedited basis.

In DFS's words, only "after the fact" did the district court interpret its February 7 anti-suit injunction order

to mean that DFS was prohibited "from opposing plaintiff's efforts to enforce in Greece the preliminary injunction." DFS Br. 48. There is a critical problem with DFS's argument that the district court's "after the fact" interpretation exceeded the court's equitable authority. DFS was not prejudiced in any way by the court's February 22 interpretation. The district court's interpretation was "after the fact" because by that point, the Harley-Davidson Greek petitions had already been heard by the Greek court, and the Greek court had already ruled in Harley-Davidson's favor. DFS had and took its full opportunity to mount a vigorous defense against Harley-Davidson's Greek petitions. It argued forcefully that the U.S. court's preliminary injunction had no effect and was unenforceable. In fact, it presented Professor White's affidavit to the Greek court and argued, as it had to the U.S. district court, and as it has on appeal, its unsubstantiated view that under Michigan law, the Harley-Davidson/Elmec Agreement did not impose any obligations on DFS. In other words, DFS defended itself against Harley-Davidson's Greek enforcement petition by raising the same issues of personal jurisdiction that it had litigated and lost before the district court. Now, on appeal from the district court's anti-suit injunction, DFS has not identified any argument or piece of evidence it was unable to present to the Greek court due to the language of the February 7 order. Rightly or wrongly, the Greek court fully heard DFS's defense to the Harley-Davidson Greek petitions.

We have been informed by the parties, however, that the Harley-Davidson Greek action is ongoing, with a

final hearing currently scheduled for September 21, 2012. DFS had the right, and still has the right, contrary to the language the district court used in its February 22 order, to appear and defend itself in that action, and we instruct the district court to modify its February 22 order accordingly.[8] However, DFS must defend itself in a manner that is consistent with the district court's February 7 order, which we affirm in every respect. In other words, it may not "contradict, impair, or otherwise affect this Court's rulings, including the December 20, 2011 preliminary injunction order, and/or this Court's jurisdiction to adjudicate the present action." (In particular, we believe, short of intervention by the Supreme Court of the United States, that this opinion closes the door on DFS's argument that the district court lacked personal jurisdiction over it.) To the extent that DFS requires further clarification or modification of the February 7 anti-suit injunction order from the district court as the Harley-Davidson Greek petitions proceed, it may seek that clarification or modification from the district court in the first instance.

---

[8] For this reason, we also instruct the district court to disregard the fact that DFS appeared in the Greek court and that it (generally) mounted a defense against the Harley-Davidson Greek petitions as evidence of DFS's bad faith in Harley-Davidson's motion for sanctions and contempt, which is pending in the district court. See Dkt. 109. However, the court may consider, in its discretion, the extent to which the specifics of DFS's defense may or may not have "contradicted," "impaired" or "otherwise affected" the district court's orders in deciding whether sanctions are appropriate.

Finally, DFS argues that the district court erred in ordering it to dismiss the DFS Greek action. When DFS filed its Greek action on November 15, 2011, DFS was actively contesting personal jurisdiction in the case before the district court. DFS contends that, "seeking relief in a Greek court was the *only* way that DFS could seek immediate affirmative relief against [Harley-Davidson] without jeopardizing DFS's pending jurisdictional defense to [Harley-Davidson's] action." DFS Br. 49. This argument is baseless. The law has long been clear that a party may appear and litigate both a personal jurisdiction defense and the merits of a case without waiving the personal jurisdiction defense. See *United States v. Ligas*, 549 F.3d 497, 502 (7th Cir. 2008) ("The federal rules permit defendants to simultaneously seek relief and raise a jurisdictional argument without waiving that defense.") (collecting cases). We explained recently that, "to waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010), citing *American Patriot Ins. Agency, Inc. v. Mutual Risk Management, Ltd.*, 364 F.3d 884, 887-88 (7th Cir. 2004) (Rule 12(b)(3) defense of improper venue was not waived or forfeited when defendant engaged in preliminary pretrial litigation activity; plaintiff should have anticipated defendant's objection, and defendant was not misleading the plaintiff or wasting judicial resources).

Whatever might be said about the merits of DFS's personal jurisdiction objection, there has never been any doubt up to this point that it contests the issue. The cases DFS cites in support of its fear that its personal jurisdiction defense might be deemed waived are simply not comparable. See *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296-97 (7th Cir. 1993) (personal jurisdiction defense deemed waived after "defendants fully participated in litigation of the merits for over two-and-a-half years without actively contesting personal jurisdiction" and "district court could properly conclude that the defendants' delay in urging this threshold issue manifest[ed] an intent to submit to the court's jurisdiction"); *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 443-44 (3d Cir. 1999) (affirming finding that defendants waived personal jurisdiction defense by doing "far more than resist[ing] an application for a preliminary injunction;" defendants raised personal jurisdiction defense in answer but actively pursued summary judgment before litigating personal jurisdiction).

International comity (the mutual respect of sovereigns) requires the courts of one nation to avoid, where possible, interfering with the courts of another. See *Allendale Mutual Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 431-33 (7th Cir. 1993); *Philips Medical Systems Int'l B.V. v. Bruetman*, 8 F.3d 600, 604-05 (7th Cir.1993). DFS has raised no argument and presented no evidence suggesting that the district court's anti-suit injunction threatened international comity. The Greek court has provisionally granted Harley-Davidson's motion for a temporary order enforcing the U.S. district court's Decem-

ber 20 preliminary injunction, and revoked its prior provisional order in the DFS Greek action. We therefore have no reason to fear that the anti-suit injunction infringed Greece's sovereignty in any way.

Even if we had some sense that international comity could become an issue, our court ordinarily allows an injunction against litigating in a foreign forum "upon a finding that letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say vexatious and oppressive." *Allendale*, 10 F.3d at 431 (internal quotations omitted). DFS argues that the district court's conclusion that its prosecution of the DFS Greek action was "vexatious and oppressive" was clearly erroneous, but we disagree. As the district court wrote in its February 7 decision, DFS's Greek action was "a blatant attempt by defendant to relitigate issues that [the court had] already decided, and it has resulted in an injunction in Greece that directly contradicts this court's orders." DFS made a conscious decision to conceal its Greek action from the district court. It then failed to disclose to the Greek court that U.S. proceedings were pending or that the TRO had been issued. It proceeded to prosecute the very issues that were being actively litigated in the U.S. district court, specifically DFS's rights and obligations under the Harley-Davidson/Elmec Agreement. Its chosen strategy was a direct threat to the jurisdiction of the district court and exposed Harley-Davidson to duplicative litigation and the possibility of inconsistent rulings. We see no error in the district court's determination that an injunction prohibiting DFS from prosecuting its action in

Greece was appropriate under these circumstances, and we affirm the district court's February 7 preliminary anti-suit injunction order.

III.  *Conclusion*

We affirm the district court's orders with instructions to modify its anti-suit injunction orders to reflect that DFS is permitted to appear and defend itself against the Harley-Davidson Greek petitions so long as it does so in a manner that is consistent with and does not infringe on the December 20, 2011 preliminary injunction or any other rulings made thus far in this proceeding — including this ruling on appeal.

AFFIRMED.